**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DEBBIE J. MATTHAI, | ) | CASE NO. 1:16CV2197 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Debbie J. Matthai ("Plaintiff" or "Matthai"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying her applications for Period of Disability ("POD") and Disability Insurance Benefits

("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(I) & 423 *et seq.* ("Act").

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a

Report and Recommendation.  For the reasons set forth below, the Magistrate Judge

recommends that the Commissioner's final decision be VACATED and this matter

REMANDED for further proceedings consistent with this decision.

## I.   PROCEDURAL HISTORY

In November 2012, Matthai filed applications for POD and DIB, alleging a disability

_____

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

onset date of November 1, 2012[2] and claiming she was disabled due to bipolar disorder II and

dyslexia. (Transcript ("Tr.") 18, 185, 216.) The applications were denied initially and upon

reconsideration, and Matthai requested a hearing before an administrative law judge ("ALJ").

(Tr. 141-144, 145-148, 149.)

On November 12, 2014, an ALJ held a hearing, during which Matthai, represented by

counsel, and an impartial vocational expert ("VE") testified. (Tr. 34-111.) On April 27, 2015,

the ALJ issued a written decision finding Matthai was not disabled. (Tr. 18-32.) The ALJ's

decision became final on July 5, 2016, when the Appeals Council declined further review. (Tr.

1-6.)

On September 1, 2016, Matthai filed her Complaint to challenge the Commissioner's

final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 16,

18, 19.) Matthai asserts the following assignments of error:

> (1)     The ALJ's discussion of treating psychiatrist Michael Primc, M.D.'s
>         medical opinion violated the treating physician rule.

> (2)     The ALJ's discussion of treating psychiatrist Laura DeHelian, M.D.'s
>         medical opinion violated the treating physician rule.

(Doc. No. 16.)

---

[2] Matthai asserts, in passing, that she orally amended her onset date to June 1, 2012
during the hearing. (Doc. No. 16 at 1, citing Tr. 108.) The ALJ cites November 1, 2012
as Matthai's onset date in his written decision. (Tr. 18.) The Court has reviewed the
hearing transcript and finds it is unclear whether Matthai sufficiently articulated her
intent to amend her onset to June 2012. (Tr. 108.) Nor does she direct this Court's
attention to any documents in the record in which she formally amends her onset date to
June 2012. As Matthai does not assign any error with regard to her onset date, however,
the Court need not decide this issue. For purposes of the instant decision, the Court will
assume the November 2012 onset date noted by the ALJ.

## II.   EVIDENCE

### A.   Personal and Vocational Evidence

Matthai was born in July 1963 and was fifty-one (51) years-old at the time of her administrative hearing, making her a person closely approaching advanced age under social security regulations.[3]  (Tr. 27.)  *See* 20 C.F.R. §§ 404.1563(d) & 416.963(d).  She has a limited education and is able to communicate in English.  (*Id.*)  She has past relevant work as a service writer, receptionist, accounts receivable clerk, and sales representative.  (Tr. 26.)

### B.   Relevant Medical Evidence

Matthai was diagnosed with bipolar II disorder in 2001, and began treatment with therapist William F. Hamilton, M.S.S.A, L.I.S.W., in 2004.  (Tr. 278, 354.)  The record reflects Matthai attended counseling sessions with Mr. Hamilton regularly between September 2004 and December 2012.  (Tr. 278-341.)  From January 2007 through December 2011, Matthai consistently presented with an anxious and/or depressed mood.  (Tr. 281-311.)  Other mental status examination findings during this time period were generally unremarkable, including normal speech, thought process, and judgment.  (*Id.*)  While Mr. Hamilton's treatment notes reflect ups and downs in Matthai's condition, he consistently noted "some levels of improvement" in reaching her mental health goals at the conclusion of each visit.  (*Id.*)  These treatment records indicate Matthai worked in various jobs throughout this time period, and often traveled and spent time with family.  (*Id.*)  At each visit, Mr. Hamilton assessed Global

---

[3] Matthai was 49 years old on her alleged disability onset date, making her a "younger person" under 20 CFR § 404.1563(c) at that time.  (Tr. 27.)

Assessment of Functioning ("GAF") scores ranging from 35 to 50, indicating serious symptoms.[4] (*Id.*)

Matthai presented to Mr. Hamilton on nine (9) occasions in 2012. (Tr. 312-320.) In January 2012, Matthai presented with a depressed and anxious mood but all other examination findings were normal, and she reported having had a "wonderful Christmas" with family. (Tr. 312.) Later that month, Matthai was "very emotional" about having lost their house to foreclosure (see Tr. 310) and the need to move into a condo. (Tr. 313.) She reported feeling angry with herself, "very sensitive," and depressed. (*Id.*) In May 2012, Matthai was feeling more positive. (Tr. 314.)

In August 2012, Matthai reported losing her job, but finding another one with "better hours, better pay." (Tr. 315.) Several weeks later, Mr. Hamilton described her as "distraught." (Tr. 316.) He explained as follows:

> Pt states that she is tired of disappointing her husband, life, and the people who hire her. Dr. DeHelian has put her on extra meds for anxiety. Pt states all was going well at her job. But– everything was very unorganized. Pt made a mistake and was caught. Her boss told her she can not make those kinds of mistakes. One of her colleagues threw her under the bus and she can not handle confrontation.

---

[4] The GAF scale reports a clinician's assessment of an individual's overall level of functioning. An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments. A GAF score between 31 and 40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. A score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

> She called in sick due to anxiety and was terminated. Pt's anxiety very high.
> Worked on crisis management and [treatment plan] objectives.

(*Id.*)

Matthai returned to Mr. Hamilton in October 2012 "appearing well." (Tr. 317.) She had found another job, this time as an assistant to an accountant. (*Id.*) Matthai reported "feeling ok" but noted her energy level was low and she had been "procrastinating a lot." (*Id.*) In November 2012, Matthai was stressed. (Tr. 318.) She "made a few mistakes at work" and was fired from her new job. (*Id.*) She was attempting to find another position but "her self confidence and anxiety levels are so high, if she has another failure she will go over the edge." (*Id.*)

Later that month, Matthai returned to Mr. Hamilton to begin working on her anxiety about being dyslexic. (Tr. 319.) Treatment notes reflect the following:

> The session began by viewing a portion on Dyslexia video. This video was very moving for this individual. This individual related that she has spent her entire life trying to hide who she is and the problems that she has had. Pt feels that one of the reasons that she can not keep a job is her dyslexia. She finally admitted this to her husband. Pt's emotions have been up and down. Work done on depression and anxiety.

(*Id.*) In December 2012, Matthai reported her mood was improving. (Tr. 320.)

On December 15 and 22, 2012, Matthai underwent a psychological assessment with Jane F. Manno, Psy.D. (Tr. 343-347.) She reported struggling in school (particularly in reading and writing) and described "a long history of occupational difficulties." (Tr. 343.) Matthai indicated she had been diagnosed with Bipolar II disorder "that is reportedly well controlled" with Zoloft and Lamictal. (*Id.*) On examination, Matthai's affect was full and her conversational speech was expressive and logical with no evidence of delusional thinking. (*Id.*) Dr. Manno noted Matthai had cancelled the first testing session due to a panic attack, and that "during subsequent

sessions, she was tearful when encountering difficulty on tasks." (*Id.*) Despite Matthai's

anxiety, Dr. Manno concluded Matthai put forth her best effort on testing. (Tr. 344.)

Dr. Manno administered a number of tests, including the Wechsler Brief Adult

Intelligence Scale IV ("WASI-III"), Test of Variables and Attention ("TOVA"),

Neuropsychological Assessment Battery ("NAB"), Wechsler Individual Achievement Test III

("WIAT 3") and Minnesota Multiphasic Personality Inventory ("MMPI-2"). (*Id.*) She

summarized the test results as follows:

> Mrs. Matthai is a 49 year old right handed woman with a history of expressive
> and receptive language differences that have never been formally evaluated. She
> is a tenth grade graduate (early pregnancy and marriage). Mrs. Matthai is easily
> hired because of her social skills and work ethic; nevertheless she has been unable
> to maintain steady employment because of difficulties following directions,
> reading accurately and keeping up with detailed paperwork.
>
> Intellectual functioning as estimated by the WASI-III was in the Low Average to
> Average range. There was a statistically significant 8 point difference between the
> Verbal Composite (87) and Perceptual Reasoning Composite (95). Clinically this
> difference would be expected to occur in about 25% of the population.
>
> Attention and memory, especially verbal memory were below expectation.
> Anxiety may be contributing to the above problems but an attentional disorder
> such as ADHD cannot be completely ruled out.
>
> Performance on the WIATT III achievement test revealed the presence of a severe
> language disorder, primarily in basic reading skills, including word recognition,
> fluency and comprehension. Writing skills are limited. Spelling is in the
> Borderline range. Math skills are in the Low Average to Borderline range.
> Executive functions, such as planning, categorization and practical judgement are
> areas of strength.
>
> Emotional functioning is notable for anxiety and situational depression. Her
> bipolar disorder appears stable. Self- esteem is low. Mrs. Matthai's anxiety may
> stem in part from her long standing academic and occupational problems.

(Tr. 346-347.)

Dr. Manno diagnosed bipolar II disorder– stable; mixed expressive and receptive

language disorder; generalized anxiety disorder; and rule/out Adult ADHD.  (Tr. 347.)  She assessed a GAF of 50, indicating serious symptoms.  (*Id*.)  Dr. Manno concluded "it is likely that Ms. Matthai's language disorder has persisted untreated since childhood," and stated "prognosis for adults with long-term expressive/receptive disorder is uncertain."  (*Id*.)  She noted that "certainly these impairments could block successful employment, even in view of Mrs. Matthai's excellent social and reasoning skills."  (*Id*.)  Dr. Manno recommended speech therapy and education, and stated "a trial of medication to manage attentional difficulties may be warranted." (*Id*.)

In August 2013, Matthai presented to Janice Carrick, Psy.D., for evaluation and treatment.  (Tr. 356-358.)  She reported low energy, low concentration, and poor appetite.  (Tr. 356.)  Matthai indicated her manic symptoms included increased mood swings, increased spending, poor work record and increased eating.  (*Id*.)  These symptoms occurred three to four times per year and each episode lasted for approximately two weeks.  (*Id*.)  Her depressive symptoms consisted of poor energy, anxiety, decreased appetite, moodiness, and low motivation. (*Id*.)  These symptoms occurred six to seven times per year and lasted for about three weeks. (*Id*.)

On mental status examination, Matthai was fully oriented and had a good fund of knowledge.  (Tr. 357.)  Her appearance, behavior, speech, thought form, thought content, and memory were normal.  (*Id*.)  Her affect was noted as both normal and angry.  (*Id*.)  Matthai's judgment was intact, and there was no indication of perceptual distortions.  (*Id*.)  Dr. Carrick diagnosed bipolar affective disorder II, and assessed a GAF of 58, indicating moderate symptoms.  (Tr. 358.)  She added Risperidone for mood stabilization, recommended yoga, and

advised Matthai to follow up in one month. (*Id.*)

In October 2013, Matthai's psychiatrist Laura DeHelian, Ph.D., submitted a letter to the Social Security Administration regarding Matthai's mental functioning.[5] (Tr. 354.) In this letter, Dr. DeHelian states as follows:

> In 2001 Debbie Matthai was diagnosed with Bipolar II disorder and was begun on medication. I have been treating her since May of 2007. Over this time I have seen a gradual but significant increase in symptomatology, both in degree and in frequency resulting in re-diagnosing her as Bipolar I Disorder, latest episode depressed (296.52).

> Over the period of time I have known her she has been successful in gaining employment doing clerical work in a variety of settings. Inevitably, however, she has lost those positions because of breakthrough symptoms of depression, mania or anxiety that have rendered her incapable of adequate performance until medication could be adjusted. Necessary medication adjustments have become more frequent and have not yielded as good a result for as long a time as in the past.

> She has been faithful with therapy and medication management appointments, and patient with medication regime changes without, unfortunately, as positive a result as has been hoped. I do not anticipate that further changes in either medication or therapy will change the present course of her disorder.

> Coupled with her ongoing information processing problems, the progression of her disorder has made maintaining ongoing employment impossible. I am recommending that she be granted disability.

---

[5] In her Brief, Matthai cites an assessment completed by Dr. DeHelian in July 2013 regarding her mental functioning, as well as Dr. DeHelian's treatment notes from November 2013 and January 2014. (Tr. 392-393, 395-396.) However, neither Dr. DeHelian's July 2013 opinion nor her treatment notes were submitted to the ALJ for consideration. Rather, Matthai first submitted these documents to the Appeals Council. As the Appeals Council denied review, this Court's review is limited to the record and evidence before the ALJ. *See Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 838 (6th Cir. 2016); *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir.2001); *Walker v. Barnhart*, 258 F. Supp.2d 693, 697 (E.D. Mich.2003); *Fink v. Comm'r of Soc. Sec*., 2013 WL 3336579 at fn 5 (N.D. Ohio June 25, 2013). Thus, the Court will not recount or consider this additional medical evidence in the instant action.

(*Id*.)  Matthai does not direct this Court's attention to any treatment notes in the record before the

ALJ (dating either before or after the above letter) that document sessions between Dr. DeHelian

and Matthai.

On April 18, 2014, Matthai began treatment with psychiatrist Michael Primc, M.D.  (Tr.

360.)  She described her symptoms as follows:

> 'Anxiety, depression is off the wall.'  'Tends to pop up out of [the] blue.'  Low
> motivation, low energy.  Diagnosis of [bipolar affective disorder] in 2001.  Felt
> it goes back to childhood.  Anxiety daily.  Needs sleep aid.  Awakens easily.
> Manic spells last hours maybe a day– compulsive shopping, racing thoughts,
> poor concentration . . . 'Cannot sit still,' talkative.  Depression can last days.
> Few days in month of either manic/depression . . . . Long history of dyslexia
> which has impacted self worth.

(*Id*.)  On mental status examination, Dr. Primc noted Matthai was "pleasant, some

tearfulness/dysphoria" but no suicidal ideation or psychosis.  (*Id*.)

Matthai returned to Dr. Primc on May 9, 2014, at which time they discussed her

"downward spiral" for the past six to seven years.  (Tr. 361.)  Her current medications were

Zoloft, Lamictal, Xanax, and Trazodone.  (*Id.*)  On examination, Dr. Primc noted Matthai was

"pleasant, circumstantial, [with] mild anxiety."  (*Id*.)  He assessed bipolar affective disorder type

II, and stated she "struggles to believe in self, easily 'falls apart.'"  (*Id*.)

On June 13, 2014, Matthai reported to Dr. Primc that she was "pretty good - so far."  (Tr.

367.)  She stated she was not getting restful sleep, and was having "trouble shutting her mind

off."  (*Id*.)  On examination, Dr. Primc noted Matthai was appropriately groomed and dressed,

with mild anxiety.  (*Id*.)  He noted "some improvement, still with some insomnia," and increased

her Xanax.  (*Id*.)

On July 11, 2014, Matthai returned to Dr. Primc complaining of a "bout of severe

anxiety/depression." (Tr. 368.) She reported crying spells, manic spells, irritability, short term

memory deficits, and poor sleep. (*Id.*) On examination, Dr. Primc noted Matthai was irritable

and anxious. (*Id.*) He offered a tentative diagnosis of bipolar affective disorder mixed, and

indicated the need for "more mood stabilizers." (*Id.*) Dr. Primc decreased Matthai's Trazodone

and Zoloft, and added Trilotan. (*Id.*)

On that same date, Dr. Primc completed an Assessment of Ability to do Work-Related

Activities (Mental). (Tr. 363-364.) He found Matthai had an "extreme"[6] degree of impairment

in her abilities to (1) maintain concentration and attention for extended periods; and (2) perform

complex, repetitive, or varied tasks. (*Id.*) Dr. Primc further found Matthai had a "marked"

degree of impairment in her abilities to (1) relate to other people; (2) attend meetings, socialize

with friends/neighbors, etc. (i.e., activities of daily living); (3) sustain a routine without special

supervision; (4) perform activities within a schedule, maintain regular attendance, and be

punctual; (5) respond to customary work pressures; (6) respond appropriately to changes in the

work setting; and (7) behave in an appropriately stable manner. (*Id.*)

Dr. Primc found Matthai had a "moderate" degree of impairment in her abilities to (1)

understand, carry out, and remember instructions; (2) respond appropriately to supervisors and

co-workers; (3) use good judgment; and (4) perform simple tasks. (*Id.*) He found she had a

"mild" degree of "deterioration in personal habits." (*Id.*)

Dr. Primc indicated the above severity of limitations had existed since at least November

---

[6] The form defines "extreme" as follows: "Major limitation with no useful ability to
function (i.e., on task 0% to 48% in an 8 hour workday)." (Tr. 363.) The term "marked"
is defined as follows: "Serious limitation, severely limits ability to function (i.e., on task
48% to 82% in an 8 hour workday)." (*Id.*) "Moderate" is defined as "significant
limitation (i.e., on task 82% to 88% in an 8 hour workday)." (*Id.*)

10

1, 2012.  (Tr. 364.)  He concluded Matthai's medications had "no significant affect" on her ability to function, and opined her condition was likely to deteriorate if she was placed under stress.  (*Id.*)  Finally, Dr. Primc found Matthai's impairments or treatment would cause her to absent from work more than three times per month.  (*Id.*)

Matthai returned to Dr. Primc on August 22, 2014.  (Tr. 371.)  She had missed her last appointment due to "panic attacks," and stated her symptoms were worse with her husband out of town.  (*Id.*)  Dr. Primc assessed "bipolar affective disorder not otherwise specified vs. type 1," and noted "persistent anxiety– may benefit from Klonopin."  (*Id.*)  He discontinued Matthai's Trazodone, added Klonopin, and advised her to return in three weeks.  (*Id.*)

On September 12, 2014, Matthai reported feeling "so-so," but "overall, more depression/anxiety."  (Tr. 372, 383.)  She discussed struggles with work, and Dr. Primc "validated [her] decision to apply for disability."  (*Id.*)  On examination, Dr. Primc noted Matthai was "pleasant, some anxiety," and indicated she was "still working through mood and anxiety issues."  (*Id.*)  He assessed bipolar disorder not otherwise specified, and panic disorder; and increased her Klonopin dosage.  (*Id.*)

Matthai returned one week later, on September 19, 2014, reporting "meltdowns," daily crying spells, and constant depression.  (Tr. 373.)  Dr. Primc noted Matthai was struggling with anxiety and depression," and prescribed Seroquel.  (*Id.*)  On October 10, 2014, Matthai reported daytime sedation on Seroquel but stated it "does help with sleep."  (Tr. 374.)  On examination, Dr. Primc noted Matthai was "pleasant, some anxiety, mild dysphoria," with no suicidal ideation or psychosis.  (*Id.*)

On October 24, 2014, Matthai reported a "bad week," with brief mania, prolonged

depression, and "some presuicidal thoughts." (Tr. 381.) She and Dr. Primc discussed "effects of undiagnosed dyslexia on [her] self-worth." (*Id.*) Matthai indicated she was taking "extra Xanax." (*Id.*) On examination, Dr. Primc noted Matthai was "pleasant, tearful at times, some dysphoria," with no suicidal ideation or psychosis. (*Id.*) He diagnosed bipolar affective disorder not otherwise specified; panic disorder; and personality disorder not otherwise specified; and increased her Xanax. (*Id.*) Dr. Primc noted Matthai "lacks anchor for identity," and is "otherwise prone to manic flight." (*Id.*)

On November 7, 2014, Matthai reported she was continuing to wrestle with depression and emotional dysregulation. (Tr. 380.) Dr. Primc noted she was "pleasant, anxious, occasionally tearful." (*Id.*) He discontinued her Zoloft and prescribed Lexapro. (*Id.*)

On that same date, Dr. Primc wrote a letter on Matthai's behalf, as follows:

> This is to update the status pertaining to the mental health of Debbie Matthai. Debbie continues to wrestle with emotional dysregulation, depression, and severe anxiety. She struggles achieving any prolonged mood stabilization in spite of being on Seroquel, Zoloft, Xanax, Klonopin, and Lamictal. It is for this reason that I strongly believe she is disabled and incapable of gainful employment.

(Tr. 376.)

On November 21, 2014, Matthai continued to wrestle with depression, but stated the medication was helping with her anxiety. (Tr. 379.) On examination, Dr. Primc noted Matthai was "pleasant," but stated she suffered from chronic anxiety/depression and "remain[ed] quite vulnerable emotionally." (*Id.*) He increased her Lexapro dosage. (*Id.*)

## C.    State Agency Reports

On May 7, 2013, Matthai underwent a psychological consultative examination with Richard Halas, M.A. (Tr. 348-352.) She reported being in special education classes in school,

repeating the fifth grade, and dropping out of the eleventh grade due to pregnancy. (Tr. 348.) Matthai reported treatment for depression, anxiety and bipolar disorder; and indicated her current medications included Zoloft, Lamictal and Xanax. (Tr. 349.) She complained of severe sleep problems, loss of appetite, low energy, crying spells, and feelings of hopelessness, helplessness, and worthlessness. (Tr. 350.)

On mental status examination, Dr. Halas noted Matthai was "cooperative yet hesitant," and "closely accompanied by her husband." (Tr. 349.) Her "most unusual or concerning behavior was a flat, hesitant and tentative presentation." (*Id.*) Matthai had a flat affect and a depressed mood. (Tr. 350.) Her speech was slow and constricted, and she gave "very short, specific, and goal oriented responses." (*Id.*) She did not exhibit fragmentation of thought or flight of ideas; however, "coherency and relevancy of the claimant's responses were assessed as being poor and below average." (*Id.*) Matthai "generally show[ed] to have relatively high levels of anxiety." (*Id.*) Her hands trembled noticeably when extended in front of her, and were damp at the conclusion of the examination. (*Id.*) Dr. Halas noted Matthai "seemed tense, anxious, and apprehensive, but not specifically phobic." (*Id.*) Her overall quality of consciousness was good, as was her short and long term memory. (*Id.*) She was able to concentrate and recall six digits forwards. (Tr. 351.) Dr. Halas estimated her intellectual level to be in the low/average range. (*Id.*)

Dr. Halas diagnosed generalized anxiety disorder and major depression, recurrent type. (Tr. 351.) He assessed a Global Assessment of Functioning ("GAF") of 45, indicating serious symptoms. (*Id.*) In terms of her mental functioning, Dr. Halas concluded as follows:

1. **Claimant's abilities and limitations in understanding remembering, and carrying out instructions.** The claimant would appear to have some problems in

13

this area. The claimant has been assessed in the past as having average or low/average intellectual levels by Dr. Mano.

2. **Claimant's abilities and limitations in maintaining attention and concentration and maintaining persistence and pace to perform simple tasks and to perform multi-step tasks.** The claimant would appear to have little or no difficulty in this area. During the mental status testing, the claimant was able to concentrate and recall six digits forwards and three of three items after five minutes. She was able to do simple calculations and Serial 7's.

3. **Claimant's abilities and limitations in responding appropriately to supervision and to co-workers in a work setting**. The claimant would appear to have significant problems in this area. Psychological symptoms of depression and anxiety are both likely to interfere with her ability to be effective and appropriate with others, including peers, supervisors, and the general public.

4. **Claimant's abilities and limitations in responding appropriately to work pressures in a work setting.** The claimant would appear to have significant problems in this area. Psychological symptoms of anxiety are likely to increase quickly under the pressures of a normal work setting.

(Tr. 352.)

Shortly thereafter, on May 14, 2013, state agency psychologist Mel Zwissler, Ph.D., reviewed Matthai's records and completed a Psychiatric Review Technique ("PRT") and Mental Residual Functional Capacity ("RFC") Assessment. (Tr. 118-119, 120-121.) In the PRT, Dr. Zwissler found Matthai was moderately restricted in her activities of daily living, and had moderate difficulties in maintaining social functioning and concentration, persistence, or pace. (Tr. 118.)

In the Mental RFC Assessment, Dr. Zwissler opined Matthai was moderately limited in her abilities to (1) understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (4) respond appropriately to changes

in the work setting; and (5) set realistic goals or make plans independently of others. (Tr. 120-121.) Dr. Zwissler concluded Matthai could understand and recall simple two to three step instructions; carry out simple routine tasks to completion without strict time demands; and adapt to minor expected infrequent changes with help setting goals to manage anxiety and avoid confrontations. (*Id.*)

On July 22, 2013, state agency physician Jennifer Swain, Psy.D., reviewed Matthai's records and completed a PRT and Mental RFC Assessment. (Tr. 132-136.) Dr. Swain reached the same conclusions as Dr. Zwissler with regard to her PRT. (*Id.*) In the RFC Assessment, Dr. Swain agreed with Dr. Zwissler's opinion regarding moderate limitations as set forth above, but found Matthai was additionally moderately limited in her abilities to (1) interact appropriately with the general public; (2) accept instructions and respond appropriately to criticism from supervisors; and (3) get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 135.) By way of explanation, Dr. Swain noted that: "[Matthai] has no trouble getting along with others, per third party. However, clmt states that she gets along with authority figures 'unless there is a confrontation.' [Dr. Halas] opined that she would have significant problems in this domain due to depressive and anxiety [symptoms.]" (*Id.*)

**D.    Hearing Testimony**

During the November 12, 2014 hearing, Matthai testified to the following:

- She did not finish high school or obtain her GED. (Tr. 48.) She lives with her husband in a condo. (Tr. 47, 70.) She has two children, ages 28 and 35. (Tr. 50.) She has a valid driver's license and drives once per week for appointments. (Tr. 47.)

- She has an extensive work history. She worked steadily from 1987 to 2012, primarily in sales, customer service, and accounting jobs. (Tr. 48-49, 51-56.) She has always been able to obtain employment because she "sells [her]self

quite well" and is personable. (Tr. 48.) She has a strong work ethic, and has always been taught that you had to work. (*Id.*)

• Although she could get jobs relatively easily, she inevitably lost them. Most of her jobs involved paperwork or required her to take notes. (Tr. 48-49, 53.) She would make mistakes because of her dyslexia. This would lead to anxiety and depression, and cause her to miss work and either quit or be fired. (Tr. 49-55, 74-79.) In one of her previous jobs, she called off work seven times in a three month period because of her anxiety. (Tr. 77.) She cannot work anymore because her depression and anxiety has "just gotten so bad." (Tr. 49.)

• She was diagnosed with bipolar disorder in 2003, and with dyslexia in 2012. (Tr. 52, 58.) She was first put on psychiatric medications in 2003. (Tr. 58.) The doctors have made many adjustments to her medications over the years, but they have not been able to find a medication or combination of medications that completely works for her. (*Id.*) She takes Lamictal, Quetiapine, and Clonazepam. (Tr. 61-62.) Her medications make her sleepy, causing her to take several two to three hour naps each day. (Tr. 67-68.)

• Her bipolar is primarily characterized by depression. (Tr. 61.) She has manic cycles sometimes but not as often. (*Id.*) She is depressed more often than not. (Tr. 62-63) She also experiences anxiety attacks once or twice per week. (*Id.*) They are triggered by "anything." (Tr. 63.) She has anxiety attacks despite her medications. (Tr. 64.)

• Her memory is awful and has deteriorated over the years. (Tr. 64.) Her long term memory is better than her short term memory. (Tr. 65.) Her attention and concentration is "very low." (Tr. 66.) She has to pause a television program and take a cigarette break, because of her concentration deficits. (Tr. 66, 71.) She does not read much because of her dyslexia. (Tr. 67.)

• She can do chores around the house but she puts them off for long periods of time due to her depression and lack of motivation. (Tr. 69.) She gets overwhelmed when she tries to cook, and has to ask her husband to help her. (Tr. 68-69.) She and her husband recently sold their home and downsized to a condo, in part because of her inability to keep up with chores and yard work. (Tr. 70-71.)

• She leaves her house once per week "if it's with my husband." (Tr. 81.) She gets overwhelmed in public. (*Id.*) She has anxiety about crowds and becomes afraid that she will have an anxiety attack and have to leave. (Tr. 81-82.) She always got along with coworkers and supervisors "until the end." (*Id.*)

• Even if she had a job that did not involve reading or writing (such as an

assembly line job), she would not be able to work because her "anxiety and depression is so bad that [she] would call off" and miss too many days of work. (Tr. 83-84.) She does not believe she can maintain a regular schedule. (*Id.*)

Matthai's husband, Doug Matthai, also testified at the November 12, 2014 hearing. Mr. Matthai testified as follows:

- He has been married to Plaintiff for 32 years. (Tr. 85.)

- Starting in 2012, he started noticing a "decline" in Plaintiff. (Tr. 86-87.) She was unreliable and more easily frustrated and discouraged. (*Id.*) He felt she "clammed up" and shut down, and was generally more depressed. (*Id.*) Around this time, Plaintiff was no longer able to hold down a job. (*Id.*)

- He also noticed a "considerable change [in Plaintiff] as far as her ability to accomplish things, thought process, reliability." (Tr. 89.) Her ability to perform chores is "a lot less" than it used to be. (Tr. 89.)

- Plaintiff does not go out of the house every day. (Tr. 94.) On average, she goes out once per week. (*Id.*)

- Plaintiff has been seeing a counselor for twenty years. (Tr. 96-97.) Her doctors are still struggling to find a medication that will work for her. (Tr. 88.)

The VE testified Matthai had past work as a service writer (SVP 7, light); officer helper (SVP 2, light); receptionist (SVP 4, sedentary); accounts receivable clerk (SVP 5, sedentary); and sales representative, hardware supplies (SVP 5, light). (Tr. 103-105.) The ALJ then posed the following hypothetical question:

So, I'd like you to imagine a hypothetical individual with Ms. Matthai's vocational profile who's limited to simple, routine tasks with no fast paced work, no strict production quotas, only simple work decision and minimal changes in the work setting. She's limited to occasional interaction with the public and finally she's limited to jobs without the need, jobs that do not require the creating or reviewing [of] paperwork. * * * No exertional or postural limitations.

(Tr. 106-107.)

The VE testified the hypothetical individual would not be able to perform Matthai's past

work, but would be able to perform other representative jobs in the economy, such as hospital cleaner (SVP 2, medium), kitchen helper (SVP 2, medium), and linen room attendant (SVP 2, medium).  (Tr. 107.)

Matthai's counsel then asked the VE to add to the above hypothetical the limitation that the individual would be off task more than 20 percent of the time.  (Tr. 108.)  The VE testified there would be no jobs available for such an individual.  (*Id*.)  Matthai's counsel then asked the VE: " What if the person was absent twice a month on average? How would that affect the jobs?" (*Id.*)  The VE testified that that level of absenteeism would preclude employment.  (*Id*.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6ᵗʰ Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b)

*and* 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Matthai was insured on her alleged disability onset date, November 1, 2012, and remained insured through December 31, 2016, her DLI.[7] (Tr. 18.) Therefore, in order to be entitled to POD and DIB, Matthai must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

---

[7] Plaintiff asserts her DLI is actually December 31, 2017. (Doc. No. 16 at fn 1). As it is not material to resolution of the issues raised, the Court need not make a determination regarding this issue.

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2.   The claimant has not engaged in substantial gainful activity since November 1, 2012, the alleged onset date (20 CFR 404.1571 et seq.).

3.   The claimant has the following severe impairments: bipolar disorder, generalized anxiety disorder, panic disorder, and dyslexia (20 CFR 404.1520(cc).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she is limited to no more than simple, routine tasks with no fast-paced work, no strict production quotas, only simple work decisions, and minimal changes in the work setting; limited to occasional interaction with the public; and limited to jobs that do not require creating or reviewing paperwork.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.   The claimant was born on July ** 1963 and was 49 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.   The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not she has transferable job skills (see SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual

functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from November 1, 2012, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 18-28.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy*, 594 F.3d at 512; *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of*

21

*Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White*, 572 F.3d at 281; *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

# VI. ANALYSIS

## *Treating Psychiatrists Drs. Primc and DeHelian*

Matthai argues the ALJ failed to give "good reasons" for discounting the opinions of her treating psychiatrists, Dr. Primc and Dr. DeHelian.  (Doc. No. 16.)  The Commissioner asserts the ALJ properly discounted these physicians' highly restrictive opinions and sufficiently articulated "good reasons" for doing so.  (Doc. No. 18.)

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record."  *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).[8]  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9).  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  *Blakley*, 581 F.3d at 408.[9]  *See also Gayheart*,

---

[8] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).

[9] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.,* as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id.* § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5). *See also Gayheart*, 710 F.3d at 376. The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406. The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id.* It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

The Court will address Matthai's arguments as to Dr. Primc and Dr. DeHelian separately, below.

### Dr. Primc

Matthai argues the ALJ's reasons for discounting Dr. Primc's July 2014 opinion do not satisfy the "good reasons" requirement. (Doc. No. 16 at 20.) She maintains the ALJ never assigned a clear weight to Dr. Primc's opinion, asserting "it is unclear to a reviewing court which 'marked and extreme limitations' the ALJ gave 'some weight' to for being unsupported by

objective findings." (*Id.*) Matthai also argues the ALJ's reasons for discounting Dr. Primc's opinion are not supported by substantial evidence because they mischaracterize her treatment record. (*Id.* at 21.)

The Commissioner argues the ALJ properly discounted Dr. Primc's opinion on the basis it was not supported by his own treatment notes. (Doc. No. 18 at 10.) She argues "while Plaintiff reported crying spells, irritability, and depression in September 2014, Dr. Primc observed she was pleasant, only mildly dysphoric with some anxiety in October 2014." (*Id.*) Thus, the Commissioner asserts the ALJ reasonably concluded these progress reports supported no more than moderate limitations overall. (*Id.*) The Commissioner also argues "[w]hile Dr. Primc opined that Plaintiff's depression and anxiety prevented her from maintaining gainful employment, her clinical presentation during her alleged period of disability (beginning November 2012) was no different than her clinical presentation during several years in which she was gainfully employed." (*Id.*)

As noted above, in July 2014, Dr. Primc opined Matthai had an "extreme" degree of impairment in her abilities to (1) maintain concentration and attention for extended periods; and (2) perform complex, repetitive, or varied tasks. (Tr. 363-364.) Dr. Primc further found Matthai had a "marked" degree of impairment in her abilities to (1) relate to other people; (2) attend meetings, socialize with friends/neighbors, etc. (i.e., activities of daily living); (3) sustain a routine without special supervision; (4) perform activities within a schedule, maintain regular attendance, and be punctual; (5) respond to customary work pressures; (6) respond appropriately to changes in the work setting; and (7) behave in an appropriately stable manner. (*Id.*) Dr. Primc found Matthai had a "moderate" degree of impairment in her abilities to (1) understand,

carry out, and remember instructions; (2) respond appropriately to supervisors and co-workers; (3) use good judgment; and (4) perform simple tasks. (*Id.*)

Dr. Primc indicated the above severity of limitations had existed since at least November 1, 2012. (Tr. 364.) He concluded Matthai's medications had "no significant affect" on her ability to function, and opined her condition was likely to deteriorate if she was placed under stress. (*Id.*) Finally, Dr. Primc found Matthai's impairments or treatment would cause her to absent from work more than three times per month. (*Id.*)

The ALJ assessed Dr. Primc's opinion as follows:

> Michael Prime, M.D., [sic] completed a medical source statement on July 11, 2014 (Exhibit 7F). Dr. Prime [sic] concluded that the claimant primarily experiences marked to extreme limitations in work- related areas. He also concluded that the claimant would be absent more than three times a month due to her impairments. Dr. Prime [sic] later concluded that the claimant is not employable (Exhibit l0F). The undersigned gives some weight to Dr. Prime's [sic] conclusions regarding marked and extreme limitations as they are somewhat supported by his treatment records. For example, Dr. Prime [sic] first saw the claimant in April 2014 and he only noted some tearfulness, dysphoria, and mild anxiety during her two visits with him prior to the first statement (Exhibit 6F). These objective findings may document some marked and extreme limitations; however, they do not support more than moderate limitations overall. The undersigned gives little weight to his conclusions that the claimant would be absent from work and is unemployable because his treatment records do not support them. He documents some mild anxiety and irritability (Exhibits 6F at 3, 8F, and 9F). Otherwise, the claimant was described as pleasant. As noted above, the claimant reported increased crying spells in September 2014; however, by October 2014, the claimant was pleasant with only some anxiety and mild dysphoria (Exhibit 9F at 5-6). In addition, the ultimate conclusion as to whether an individual satisfies the statutory definition of disability is reserved to the Commissioner (Social Security Ruling 96-5p).

(Tr. 25.)

The Court finds the ALJ failed to properly evaluate Dr. Primc's July 2014 opinions of

marked and extreme limitations.[10]  The ALJ's assessment of Dr. Primc's opinion is unclear and

prevents this Court from conducting a meaningful review.  As set forth above, the ALJ accorded

"some weight to Dr. Prime's [sic] conclusions regarding marked and extreme limitations as they

are somewhat supported by the record."  (Tr. 25.)  The ALI also indicated the "objective findings

may document some marked and extreme limitations; however, they do not support more than

moderate limitations overall."  (*Id*.)  Read together, these statements appear to indicate the ALJ

may have agreed with some of Dr. Primc's opinions of marked and/or extreme limitations to

some extent.  However, the decision fails to adequately explain which "marked and extreme

limitations" the ALJ believes are "somewhat" supported by the objective findings and, further,

fails to explain how or to what extent (if any) the ALJ accommodated any of these limitations in

the RFC.  This is significant because the form completed by Dr. Primc defines an "extreme

limitation" as one where an individual would be on task only 0% to 48% of an 8 hour workday;

and a "marked limitation" as one where an individual would be on task 48% to 82% of an 8 hour

workday.  (Tr. 363-364.)  Thus, the extreme and marked limitations proffered by Dr. Primc

indicate Matthai would likely be off-task more than 20% of the workday, rendering her

unemployable according to the VE's testimony.  (Tr. 108.)  In light of the above, the Court finds

the ALJ's failure to explain the weight given to Dr. Primc's opinions concerning Matthai's

specific mental limitations contravenes the Agency's procedural requirements and prevents this

_____

[10] In her Brief, Matthai acknowledges that "it is well-settled that a physician's statement
that an individual is 'disabled' or 'unemployable' is not entitled to any special weight
under the regulations as this is an issue reserved to the Commissioner as the ALJ
properly notes.  Thus, Matthai takes no issue with the dismissal of Dr. Primc's statement
that: 'It is for this reason that I strongly believe she is disabled and incapable of gainful
employment.'" (Doc. No. 16 at fn 8).

Court from conducting a meaningful review.  *See Rogers*, 486 F.3d at 242; *Gayheart*, 710 F.3d at 376; *Wooldridge v. Comm'r of Soc. Sec.*, 2015 WL 5608199 at * 10 (S.D. Ohio Sept. 24, 2015).

The Commissioner argues, however, the ALJ sufficiently articulated that he found Dr. Primc's opinion only supported "moderate limitations overall" and, further, that the ALJ set forth "good reasons" for this finding.  The Commissioner relies on the ALJ's statement that he gave "little weight" to Dr. Primc's opinion that Matthai would be absent more than three times a month on the basis that it was not supported by his own treatment records.  She asserts this conclusion is supported by substantial evidence, noting the ALJ reasonably found Dr. Primc's treatment records documented "some mild anxiety and irritability" but otherwise described Matthai as "pleasant."  (Tr. 25.)

The Court rejects the Commissioner's argument, and agrees with Matthai that the ALJ failed to fully and accurately characterize Dr. Primc's treatment records.  The record reflects Matthai presented to Dr. Primc on four occasions prior to his July 2014 opinion; i.e., on April 18, 2014; May 9, 2014; June 13, 2014; and July 11, 2014.  (Tr. 360, 361, 367, 368.)  During her April 2014 visit, Matthai stated her anxiety and depression were "off the wall."  (Tr. 360.)  She reported manic spells resulting in racing thoughts and poor concentration, as well as depression that could "last for days."  (*Id.*)  Dr. Primc noted Matthai was "pleasant," but also tearful and dysphoric.  (*Id.*)  In May 2014, Matthai reported being in a "downward spiral" despite treatment with Zoloft, Lamictal, Xanax, and Trazodone.  (Tr. 361.)  Dr. Primc found Matthai was pleasant, circumstantial, and mildly anxious, and noted she "easily falls apart."  (*Id.*)  Dr. Primc observed "some improvement" in June 2014.  (Tr. 367.)  In July 2014, however, Matthai reported crying spells, manic spells, irritability, short term memory deficits, and poor sleep.  (Tr. 368.)  Dr.

Primc noted Matthai was irritable and anxious and needed "more mood stabilizers." (*Id.*) Matthai was scheduled to return later in July, but missed her appointment due to a panic attack. (Tr. 371.)

The Court finds the ALJ failed to fully address Dr. Primc's treatment records. The ALJ emphasized Dr. Primc's mental status examination findings that Matthai was "pleasant" and mildly anxious, but did not fully address Matthai's severe symptoms or Dr. Primc's findings that she was tearful, dysphoric, and circumstantial. Nor did the ALJ discuss Dr. Primc's findings that Matthai "easily falls apart" and needed "more mood stabilizers" despite the fact that she was taking four different psychiatric medications. (Tr. 361, 368.) Rather, the ALJ appeared to place great weight on the fact that Matthai was "pleasant" during her appointments with Dr. Primc. The ALJ does not, however, explain how Matthai's ability to be "pleasant" to her psychiatrist during the course of their thirty-minute appointments, is inconsistent with Dr. Primc's assessment that she has extreme limitations in maintaining concentration and attention for extended periods, and performing complex, repetitive or varied tasks.

The Court also notes that, while the ALJ referenced two of Dr. Primc's later treatment notes, he similarly failed to fully or accurately address their contents. Specifically, the ALJ noted that "the claimant reported increased crying spells in September 2014; however, by October 2014, the claimant was pleasant with only some anxiety and mild dysphoria." (Tr. 25.) The ALJ, however, failed to note the following concerning findings. In August 2014, Dr. Primc assessed "persistent anxiety" and prescribed Klonopin. (Tr. 371.) The following month, Matthai reported meltdowns, daily crying spells, and constant depression; and Dr. Primc prescribed Seroquel. (Tr. 373.) In October 2014, Matthai reported mania, prolonged depression,

and "some presuicidal thoughts," and admitted to taking "extra Xanax." (Tr. 381.) Dr. Primc noted Matthai was tearful and dysphoric, and "prone to manic flight." (*Id*.) In November 2014, Matthai reported some improvement but Dr. Primc found she "remained quite vulnerable emotionally" and increased her Lexapro dosage. (Tr. 379.) In his November 7, 2014 letter, Dr. Primc affirmed that Matthai continued to suffer from emotional dysregulation, depression and "severe anxiety," finding she "struggles achieving any prolonged mood stabilization in spite of being on" five different psychiatric medications.[11] (Tr. 376.) The Court finds the ALJ's characterization of these records as showing that Matthai was pleasant and only mildly anxious, was perfunctory, misleading, and not supported by substantial evidence.

Finally, the Court rejects the Commissioner's argument that the ALJ reasonably discounted Dr. Primc's opinion because Matthai's "clinical presentation during her alleged period of disability (beginning November 2012) was no different than her clinical presentation during several years in which she was gainfully employed." (Doc. No. 18 at 10.) The ALJ did not offer this as a reason for rejecting Dr. Primc's opinion, and the Commissioner cannot cure a deficient opinion by offering explanations never offered by the ALJ. As courts within this District have noted, "arguments [crafted by defense counsel] are of no consequence, as it is the opinion given by an administrative agency rather than counsel's '*post hoc* rationale' that is under the Court's consideration." *See, e.g., Blackburn v. Colvin,* 2013 WL 3967282 at * 8 (N.D. Ohio

---

[11] The Commissioner challenges Dr. Primc's conclusion that Matthai was unable to achieve mood stabilization despite medication as being inconsistent with Dr. DeHelian's treatment records from January 2014. (Doc. No. 18 at 11-12.) However, as the Commissioner acknowledges, Dr. DeHelian's January 2014 treatment note was not submitted to the ALJ and, therefore, may not be considered by this Court in the instant appeal. *See Miller*, 811 F.3d at 838; *Foster*, 279 F.3d at 357; *Walker*, 258 F. Supp.2d at 697; *Fink*, 2013 WL 3336579 at fn 5.

July 31, 2013); *Cashin v. Colvin*, 2013 WL 3791439 at * 6 (N.D. Ohio July 18, 2013); *Jaworski v. Astrue,* 2012 WL 253320 at * 5 (N.D. Ohio Jan. 26, 2012).

Accordingly, and for all the reasons set forth above, the Court finds the ALJ failed to set forth with sufficient clarity the weight ultimately afforded to Dr. Primc's opinions concerning Matthai's specific mental limitations and, further, failed to articulate "good reasons" for rejecting those opinions. The Court further finds a remand is necessary to allow the ALJ an opportunity to sufficiently evaluate and explain the weight ascribed to the specific limitations assessed by Dr. Primc.

### Dr. DeHelian

In her second assignment of error, Matthai argues the ALJ failed to articulate "good reasons" for assigning "limited weight" to Dr. DeHelian's July 2013 opinion. (Doc. No. 16 at 23.) She maintains that, while Dr. DeHelian's treatment records were not before the ALJ, other "treatment records from Psychological & Behavioral Consultants where Dr. DeHelian practiced . . . . actually support the limitations assessed by Dr. DeHelian," including the low GAF ratings assessed by Matthai's long time therapist Mr. Hamilton. (*Id*. at 24.) Matthai further asserts the ALJ "failed to acknowledge the consistencies between the opinions of both of Matthai's psychiatrists and the consultative examiners." (*Id*. at 25.)

The Commissioner asserts the ALJ provided "good reasons" for discounting Dr. DeHelian's opinion. (Doc. No. 18 at 12.) She argues that "prior to the ALJ's decision, Plaintiff provided no treatment notes from Dr. DeHelian . . . Accordingly, it was reasonable for the ALJ to find that there was no medical evidence to support Dr. DeHelian's findings that Plaintiff would miss work more than four times per month and was incapable of maintaining

employment." (*Id.*)

Dr. DeHelian completed two medical source opinions relating to Matthai's mental functional limitations. On July 8, 2013, Dr. DeHelian completed an "Assessment of Ability to Do Work-Related Activities (Mental)," in which she opined Matthai had "marked" limitations in her abilities to (1) maintain concentration and attention for extended periods; (2) sustain a routine without special supervision; (3) perform activities within a schedule, maintain regular attendance, and be punctual; (4) respond appropriately to supervision; (5) respond to customary work pressures; (6) respond appropriately to changes in the work setting; and (7) perform complex, repetitive, or varied tasks. (Tr. 392-393.) She also found Matthai was moderately restricted in her abilities to (1) attend meetings, socialize with friends, etc.; (2) understand, remember, and carry out instructions, and (3) behave in an emotionally stable manner. (*Id.*)

In this opinion, Dr. DeHelian indicated the above severity of Matthai's limitations had existed since at least November 1, 2012. (Tr. 393.) She concluded Matthai's medications had caused "some tiredness/drowsiness," and opined Matthai's condition was likely to deteriorate if she was placed under stress. (*Id.*) Finally, Dr. DeHelian found Matthai's impairments or treatment would cause her to absent from work more than three times per month. (*Id.*)

Later, in October 2013, Dr. DeHelian submitted a letter to the SSA regarding Matthai's mental functioning. (Tr. 354.) She indicated she had treated Matthai since May 2007 and had "seen a gradual but significant increase in symptomatology, both in degree and in frequency resulting in re-diagnosing her as Bipolar I Disorder, latest episode depressed." (*Id.*) Dr. DeHelian further noted Matthai's difficulty in sustaining employment due to "breakthrough symptoms of depression, mania, or anxiety" and stated "necessary medication adjustments have

become more frequent and have not yielded as good a result for as long a time as in the past."

(*Id*.) Dr. DeHelian did not believe "further changes in either medication or therapy will change

the present course of [Matthai's] disorder." (*Id*.) She concluded that "[c]oupled with [Matthai's]

ongoing information processing problems, the progression of her disorder has made maintaining

ongoing employment impossible." (*Id*.)

As an initial matter, the Court rejects Matthai's argument the ALJ was required to

articulate "good reasons" for discounting Dr. DeHelian's July 2013 opinion. The record reflects

Matthai did not submit this opinion to the ALJ. Rather, Dr. DeHelian's July 2013 opinion

(marked as "Exhibit 12F") was first submitted to the Appeals Council and was not before the

ALJ when he authored the decision at issue herein. *See* Tr. 4 (listing additional medical records

submitted to the Appeals Council as including "Exhibit 12F: Medical Assessment of Mental

Abilities from Laura DeHelian, Ph.D., dated July 8, 2013") and Tr. 32 (listing the medical

records before the ALJ as Exhibits 1F through 11F). Clearly, the ALJ was not required to

address a medical source opinion that was not in the record before him.

Dr. DeHelian's October 2013 letter was, however, in the record before the ALJ. The

ALJ addressed this opinion as follows:

> Laura DeHelian, Ph.D., completed a medical source statement on October 14,
> 2013 (Exhibit 4F). Dr. DeHelian concluded that the claimant is not employable.
> She noted that the claimant does not have a problem gaining employment;
> however, she has lost those positions because of breakthrough symptoms. The
> undersigned gives limited weight to the conclusions of Dr. DeHelian as the
> ultimate conclusion regarding disability is reserved to the Commissioner. In
> addition, while we have treatment records from Psychological and Behavioral
> Consultants, we do not have any treatment records from Dr. DeHelian to
> support her extreme conclusions (See Exhibits IF, 2F, 9F, and 1lF). These
> records document the objective findings discussed above, which document no
> more than moderate limitations.

(Tr. 24-25.)

        The Court finds the ALJ sufficiently articulated "good reasons" for according less than

controlling weight to Dr. DeHelian's October 2013 letter opinion.  As an initial matter, the Court

notes Dr. DeHelian does not opine that Matthai has any specific mental functional limitations in

her October 2013 letter.  Rather, Dr. DeHelian explains generally that Matthai (1) has had an

increase in symptomatology, "both in degree and frequency;" (2) has been able to obtain

employment but "inevitably" loses jobs due to breakthrough symptoms of depression, mania, or

anxiety; (3) has been faithful with therapy and medication management but has not had as

positive a result "as has been hoped;" and, therefore, (4) is unable to maintain ongoing

employment.  (Tr. 354.)  This letter fails to articulate any particular functional limitations

regarding Matthai's mental abilities, such as her abilities to maintain concentration, persistence

or pace; respond appropriately to supervisors, coworkers, and/or the public; respond

appropriately to changes in the work setting; etc.  Thus, it is not clear what specific mental

functional limitation Matthai believes the ALJ should have articulated "good reasons" for

rejecting.  *See Arthur v. Colvin*, 2017 WL 816995 at * 13 (N.D. Ohio Jan. 18, 2017) (finding the

absence of "function-by-function limitations" supports an ALJ's decision to assign less than

controlling weight to a treating physician's opinion).

        Indeed, the only specific opinion set forth in Dr. DeHelian's October 2013 letter

opinion is that "the progression of [Matthai's] disorder has made maintaining ongoing

employment impossible."  (Tr. 354.)  As Matthai herself acknowledges, however, a physician's

statement that an individual is "disabled" or "unemployable" is not entitled to any special weight

under social security regulations, as the ultimate question of disability is reserved to the

Commissioner. *See* 20 C.F.R § 404.1527(d) (stating that "[w]e are responsible for making the determination or decision about whether you meet the statutory definition of disability. In so doing, we review all of the medical findings and other evidence that support a medical source's statement that you are disabled. A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."). *See also Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir.2007) (social security regulations "further elaborate[] that no 'special significance' will be given to opinions of disability, even if they come from a treating physician."); *Arthur*, 2017 WL 816995 at * 13 (stating that "the fact that Dr. Bonasso encouraged Plaintiff to apply for disability is not a medical opinion under the regulations, as it goes to the ultimate issue of disability, which is a matter reserved for the Commissioner."); *Littleton v. Comm'r of Soc. Sec*., 2013 WL 6090816, at *9 (N.D. Ohio Nov. 19, 2013)("The question of whether a claimant is disabled is an issue expressly reserved for the Commissioner and does not constitute a medical opinion.").

Moreover, it is uncontested that the record that the record before the ALJ did not include any of Dr. DeHelian's treatment records. As noted *supra*, the opinion of a treating physician must be based on sufficient medical data and upon detailed clinical and diagnostic evidence. *See Harris*, 756 F.2d at 435; *Blakley*, 581 F.3d at 406. *See also* 20 CFR § 1527(d)(3) (identifying "supportability" as a relevant consideration in determining the weight to assign a medical opinion.). Dr. DeHelian's October 2013 letter opinion provides a general overview of Matthai's treatment history but does not contain any specific medical findings, other than her diagnosis of Bipolar I Disorder. In the absence of any records relating to Dr. DeHelian's treatment of Matthai (and combined with the fact that Dr. DeHelian did not offer an opinion as to

any specific functional limitations), the Court finds it was not unreasonable for the ALJ to accord only limited weight to Dr. DeHelian's October 2013 letter opinion.

Accordingly, the Court cannot find that the ALJ erred in his evaluation and assessment of Dr. DeHelian's October 2013 letter opinion. However, as the undersigned is recommending remand on the basis of the ALJ's failure to articulate "good reasons" for discounting Dr. Primc's opinion, the Court recommends the ALJ reconsider Dr. DeHelian's October 2013 opinion in light of the additional evidence submitted to the Appeals Council, including Dr. DeHelian's July 2013 opinion and her treatment notes dated November 2013 and January 2014.

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and the matter REMANDED for further proceedings consistent with this decision.

____<em>s/Jonathan D. Greenberg</em>_____
Jonathan D. Greenberg
United States Magistrate Judge

Date: May 25, 2017

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**